Good morning, Your Honors. May it please the Court, my name is Alexa Torres and I represent Petitioners Chen Ai Hua and Li Jin Ju in this case. Can you just talk a tad louder? Sure. Yeah, great, thanks. This case involves a petition for review of a decision of the Board of Immigration Appeals in which the Board dismissed Petitioners' appeal of the immigration judge's denial of persecution. There are multiple issues in this case, but I would like to start in addressing the Board's finding that the petitioners did not establish a well-founded fear of persecution based on their practice of Christianity. And I would like to note that the Board adopted and affirmed the IJ's decision, so we're looking at both the Board's decision and the IJ's decision. Now, both the Board and the IJ discussed the State Department report specifically focusing on the 2010 International Religious Freedom Report as well as the 2007 Profile of Asylum Claims. And in discussing these State Department reports, they noted that the treatment of underground churches in China by the Chinese government varied from area to area. Now although the Board and the IJ stressed that the treatment varies from locality to locality, they did not properly consider the evidence from the petitioner's specific locality in which it does establish that Christians who attend underground churches in China are persecuted. Specifically in the record is evidence of the petitioner's mother who was persecuted for attending underground church in the petitioner's locality. Now the IJ's only mention of this evidence was to state that the petitioner's mother has not had any trouble in the past two years and that petitioners, the fact that petitioner Chen's parents attend underground church currently undermines the petitioner's claim. The Board, however, found that the IJ erred in stating this because there's no evidence that the petitioner's parents continue to practice their religion in underground church in China. This was the only mention by the Board and the IJ of this very that Christians are persecuted in the petitioner's locality. After stressing that the treatment of underground churches varies from locality to locality, they just ignored this evidence. Now this, the mother's letter is very material to this claim. She states that not only was she arrested and detained for six days, during which time she was interrogated and beaten, she was only released upon paying a 2,500 yuan bond, but she was also forced to sign a guarantee letter promising to never attend what the Chinese government calls illegal gatherings. And then if she did, the consequences could be so severe as to include being sentenced to a reform through multiple levels. First of all, she wasn't allowed to practice her religion freely. She was arrested and beaten. And even before that, if you take a look at her letter, she states that she and her other church members, they practice secretly in underground churches in different locations. They dare not have too many members. Now other circuit courts have found that having to practice your religion underground to avoid punishment is itself persecution. They both testify that they were going to live with Li's family, a city household, and not with the family of the mother, so that there wasn't any evidence about religious persecution there. Yes, first of all, they both are from the Fujian province. They're from the same local Fujian province. But also, Petitioner Li did testify that when he was in China, he attended an underground church. The Public Security Bureau came to his home to arrest him. He went into hiding, and then he escaped. After he left, police continued to come to his home looking for him. And it should be noted that the immigration judge- Well, I understand all that, but they both testified, both of your clients testified, that they would go live in the city with Li's parents. And so, you know, China's a big place, arguably evidence about persecution of religion in one part of the country wouldn't flow to another part of the country. So was there evidence about religious persecution in the city? Yes, that was actually Petitioner Li's location. It was the male petitioner, Petitioner Li, who escaped the persecution when the police came looking for him. I thought it was the underground church was in the country, no? The mother, Petitioner Chen's mother, was persecuted in the local village. Petitioner Li escaped persecution in the city. And what I thought you said to us, which was key to this, was the mother's testimony. Now you're saying it's Li's testimony, is that right? Both, both, Your Honor. I'm saying that the mother was persecuted in their local Fujian province, and Petitioner Li escaped persecution even more locally in that city, where they'll return to. I have a question. I'm just curious about, in your brief, you led with the argument about the family planning claim, yet you're leading your oral argument off with your religious claim. I'm just curious as to why you decided to switch? I am certainly going to get to the family planning claim. There's no time like the present. I'm sorry? Oh, okay. Well, I mean, let me speak a little bit more on the Christian claim. Not only did the board and the IJ not properly consider this local evidence regarding the petitioner's locality in terms of the treatment of underground churches, in their discussion of the State Department reports, both the board and the IJ were very, very selective in their reading of the State Department reports. They essentially just cherry-picked quotes that don't support the petitioner's claim, while ignoring quotes that do support the petitioner's claim. In fact, in addition to their statements regarding the fact that the treatment varies from locality to locality, the board only selected, I'm sorry, the IJ only selected four quotes. And in fact, one of the quotes that the IJ selected specifically stating that house churches are quietly tolerated as long as they're small and non-obtrusive. Well, if you look on that same page of the 2007 profile, just a couple paragraphs above that statement, it actually states that house churches are often repressed, sometimes quietly tolerated. Often repressed, sometimes quietly tolerated. The IJ did not mention this. Now, the petitioners aren't arguing that the State Department reports shouldn't be relied on at all. They're just arguing that they certainly shouldn't be used just to cherry-pick quotes that don't support their claim and ignore quotes that do. And now, to get to the family planning claim, just as the board and the IJ were very selective in their reading of the State Department reports with regard to the petitioner's Christian claim, they were very selective in their reading of the petitioner's evidence regarding their family planning claim. With regard to the issue as to whether the petitioner's children will be counted under the family planning policy, thereby putting the petitioners at risk of being forcibly sterilized, the IJ discussed the 2007 profile, which states that if children aren't registered in the household, they won't be counted towards the family planning policy. Likewise, the board found that the petitioners may choose to register their children. This just is not true. That's clearly erroneous. In fact, in the record is the household registration regulation, which states that the HUCO, which is the household registration booklet, it's mandatory for all PRC citizens aged one month and over. There's no choice. They have to register. The board also found that the petitioners do not face persecution because their children are U.S. citizens. It is true that the U.S. government views the petitioner's children as U.S. citizens, but what's relevant is the way the Chinese government views them. Do you argue the Robert Lin document in front of the IJ? I'm sorry, Your Honor, which document? I'm talking about the Robert Lin posting on the Pujan Province website. The administrative? The answer to Comrade Robert Lin, who is asking a question about two children, a child being born. I'm not sure if we specifically refer to that, but actually in the record, there's the evidence. Do you know whether you referred to that? Did you rely on that as evidence? Because I was surprised that there was no mention of that document in either the BIA decision or the IJ's decision. I don't believe that was specifically referenced, Your Honor, but in the record is China's nationality law, which is very clear. It states if both parents or either parent is a Chinese citizen, even if the child is born in a foreign country, that child will be considered a Chinese citizen. It's irrelevant to the Chinese government that the U.S. government considers the petitioner's children U.S. citizens. China does not recognize dual nationality. That's right in China's nationality law. Also, the tips for travelers located in the record on appeal reiterates the nationality law. The petitioners also submitted the Chinese travel documents of the petitioner's children, which clearly states that the bearer of this travel document is a citizen of the, I'm sorry, of the People's Republic of China. Furthermore, the Department of Homeland Security investigation, which is in the record, states Chinese nationals who have not obtained permanent residence or long-term residence overseas or resident visas for three years or above shall be sanctioned in compliance with the relevant family planning rules and regulations upon returning to mainland China if they have conducted any birth acts in violation of the family planning regulation. So because the board and the IJ erroneously found that the petitioner's children will not be considered Chinese citizens and they won't count towards the family planning policy, they failed to properly consider evidence of similarly situated Chinese citizens who have been forcibly sterilized. Now, you had the, you had the Renzong Wuan, I don't know how to pronounce it, the, why you, Wan is it? Document? Wuan, yes. In the record? Yes, Your Honor. And argued that, and is that what the IJ was referring to on page 16 saying affidavit from an individual who allegedly was sterilized upon, upon return to China? Yes, Your Honor. Is that the, is that the affidavit? Yes, that's the affidavit. And the court just said it, apparently the IJ said it was a potentially biased source. Is there anything else in the IJ's report that you find that says why the, the IJ discounted that? Yes, they, both the IJ and the board focused on the fact that there was no foundation laid for. I don't think the IJ did, the board did. Yes, but you're right, Your Honor, besides that there wasn't very much analysis of this Chinese citizen who had two U.S. citizen-born children, was forced to return back to China, and upon entering China was caught by the police. He was imprisoned and indefinitely unless he voluntarily submitted to sterilization. Of course, it's not voluntary when you're coerced into it. Now, the board in dealing with that document said that no foundation or explanation was obtained, and that the Chinese attorney procured the documents, is that correct? Yes, Your Honor, that is correct, but I point you to actually more... Why wasn't the board entitled to view that with suspicion then, if, if the proponent of the document had no idea of its provenance? I'm sorry, if the... If the proponent of the document, you, didn't know where it came from. We, we do personally know where it came from. It came from another attorney who is a former client of another attorney. Okay, the, the board said it appears to have been submitted to support another asylum applicant. Now, is that sufficient? I mean, I'm, I'm very concerned about that affidavit, the context, the text of it. I mean, it's, it's chilling when you read it, and it does refer to two children being born in the U.S., but it, it does seem to me that an argument can be made that the board had legitimate concerns with the authenticity of the document, and don't you have to do more than just say we got it from a lawyer in another case? I, I understand those concerns, Your Honor, but there is actually more relevant evidence in the record specifically to the petitioners, both Petitioner Chen and Petitioner Lee's locality of people being forcibly sterilized after having two children. And as I stated... After having two children born in the United States? In China, in China, yes. Right, but this, this other document was significant because both those children were born in the U.S., were they not? Yes, they were, but I submit to Your Honor that the fact that the petitioner's children were born in the United States is not a sufficient basis to distinguish their situation from other Chinese citizens who are forcibly sterilized in China. Don't you run up against, and I'm really trying to look for a basis to, to see if there's a gap here, but don't you run up against our Ghana-Hassa case then, where we say that, let me give you the language, absent powerful contradictory evidence, the existence of a State Department report supporting the BIA's judgment will generally suffice. And the, the, the 2007 report does say, with regard to the two children born in the U.S., that that's, or that children born in the U.S. are not counted, is it not? And Your Honor, I'm arguing that that's absolutely incorrect. As I stated, there's extensive evidence establishing that clearly there will be considered Chinese citizens. They must be registered in the household registration, and there is no sufficient basis to distinguish these individuals from other individuals who are forcibly sterilized. But they can't receive health care. They can't go to school, you're saying, if they aren't registered. And what else can't they, can't happen? Well, the thing is, Your Honor, I mean, these people, the petitioners are fearful of persecution. They're already fearful of being persecuted because they've had too many children and because they're Christians. Are we now asking them to violate more laws in China? It clearly, the household registration regulation says it's mandatory to register. They don't have a choice. And not only that, even if they do not register, Your Honor, I mean, children are not little pieces of paper that you can fold up and tuck away in your back pocket and hide. They're human beings. They're people. They will be found out. It's just common sense that if these children are living in China, the Chinese government will find out about that. Now, in addition to failing to properly consider this evidence of other people sterilized in China, both the board and the IJ also failed to properly consider the certificates from the local family planning committees, which do establish that the petitioners face at least a reasonable possibility of persecution if they return to China. Your Honors, I see my time is up. Thank you. Let's hear from the Department of Justice. Thank you, Your Honors. Good morning. Walter Bocchini for the Department of Justice. Your Honors, in this case, as this Court has previously found, the Department of State reports provide powerful evidence in support of the agency's decision. And here, the agency fully weighed the record evidence and relied on Department of State reports to find that petitioners don't have. Well, if the agency didn't discuss a piece of evidence and so didn't distinguish it, would that require a remand? Absolutely not, Your Honor. I mean, first of all— So I thought you just told me that they considered everything. I think there's a difference between consideration and explicitly discussing a piece of evidence. I think the courts recognize that. And I think it was in the Guna Hasek— I thought that might be your answer. But then you come to the conclusion, could anyone in the position of these petitioners prevail given the 2007 country report and a general claim by the administrative agency that it's considered all the contrary evidence? Not any discussion of that evidence, but a general claim or dismissal of that evidence. No, I think the agency would not be able to do that. I think every case has to be— Why not? Because every case has to be considered and adjudicated on the evidence presented before it. But you just told me in your prior answer that considering it doesn't mean discussing it or even mentioning it. Well— So I'm positing to you, how could anyone in their position ever prevail given the 2007 country report, which is strong evidence, and a general statement by the agency, we've rejected all the contrary evidence? Well, I think— Do we always affirm that? No, I think the court has to look whether the—I mean, again, the court has to look whether the agency did in fact consider it. And I think here— And if we find it considered and rejected it for the wrong reasons or doesn't seem to have considered it at all, we remand? I think if the agency hasn't considered specific evidence that is relevant, then yes, I think remand would be required. What about this 2003 administrative opinion from Chang Li City Family Planning Administration of Fujiang Province? Reproductive behavior in violation of family planning enforcement in China by Chinese nationals who have not been granted permanent residence overseas or at a minimum three years of temporary legal residence in a third country shall be sanctioned in compliance with family planning rules and regulations as enforced by the local administrative level. Is that at all discussed in any of the administrative review in this case? I think the agency did in some ways discuss what's included there. I mean, saying that because these are— Discussed this report? Well, it didn't—  No, I'm sorry. I'm sitting in a site to that. I won't. No, I'm not going to say it discussed the specific report. But I think they considered those types of evidence in the record because they're saying that this is— These are parents of United States citizen children. Right, and that's what this directs itself to, United States citizen children. Right. Well, before somebody can be in violation of local family planning law, they have to register their children, and the Department of State reports provide that that's not a requirement for parents of United States citizen children. They don't have— I would go back to my original question, and your answer may be yes, given this 2007 country report, people can never prevail. I don't want to say that, Your Honor, because— Well, I'm sure you don't. No, no. There's no reason why that's not the case, given your argument. No, because I think, you know, as the court has explained in the Chen V.I.N.S. case from 1999, there has to be sort of a sliding scale balance where there's objective evidence and there is individualized evidence, and if the country report evidence shows that persons in those circumstances aren't likely to face persecution, you have to come forth with strong individualized evidence of risk to yourself, and I don't know in other cases what that might be, but in this case, the individualized evidence of risk really isn't enough. There are problems at every front from the evidence the petitioners presented, so I really can't say that they will never be able to overcome the 2007 profile, but on the evidence presented on this record, it is not sufficient, because that report states that parents of United States citizen children don't need to register their children, and even if they do register their children, they face at most fines and other economic pressures, and they provided evidence to show, you know, saying, well, no, you know, several affidavits saying that, no, they're going to be sterilized. That's just not the case. The affidavits were by parents of Chinese-born children who had no basis to conclude that these petitioners would face sterilization. And what about the Ren Zun Wu document? Yes, Your Honor, I mean, I agree with you, as you pointed out, that is some chilling language in that report, but for the reasons the board stated, and for the immigration judge, you know, the immigration judge found that those documents, that document was not persuasive as the country report, and the board You know, the country report, it really doesn't give one a lot of confidence when it starts out saying, according to the Fujian birth planning committee, they don't force abortions or sterilizations. Well, come on. Well, I mean, it doesn't, it does not appear to be But nothing's been, we don't know, but we can't verify whether there's been no reports, no sterilization. But I think the report also says that consular officials are not aware of any parents of United States citizen children that have faced forced sterilization upon their return to China. And it also states that people in contact with doctors who are in contact and visa applicants in contact with the consular officials also have not reported that there had been, that force has been used to enforce compliance. What happened to this Robert Lin document that found its way into the record? It looks like page nine. I'm not sure exactly, but it came out of the record. Are you familiar with that document? Unfortunately, I did. It's a 4,300 page record, and I became familiar with We have one 4,300 page record No, I know. I know, Your Honor. I'm sorry, page 823. Yeah, I don't think that was specifically referenced by the petitioners in their case. Right, but I find this rather compelling, too, because it's from the province's own website saying if you have two kids, you're still out of luck. If they're born in the United States, it doesn't change the equation. They're still illegal. Doesn't it say that? Unfortunately, Your Honor, I'm really not familiar with that piece. It says, Dear Comrade Robert Lin, the answer to your email is as follows. According to the situation that you described, and the description is, gave birth to a baby girl and a baby boy who were both U.S. citizens and gave birth while in America. And then the response, and this is on page 824, is according to the situation you described, giving birth to two children, a boy and a girl, is already a violation of the provisions under the Pujan Province Population Planning and Family Regulation. And then it talks about a person who procreates in violation of this section is subjected, and then it talks about the penalties that apply. And it says, beside certain above-mentioned categories, this is on 825, there is no exception and sterilization is mandatory. Do you know what happened? How this document got into the record? I mean, it's in the record, and it's from the province website, and it's really curious to me that nobody mentions it. It's just like it's sort of there, and yet it appears to be fairly straightforward on the subject of children born in the United States, and certainly would cast some sort of a shadow on the country's report, assertion that they don't know anything about this type of situation being a problem. Right, Your Honor, I wish the agency had referenced that document, but it wasn't pointed out to the agency. I don't know what happened with Robert Lynn, with this particular person. I would say that maybe if the petitioners registered their children, they would be counted against. I just, I mean, the fact of the matter is, again, I would point back to the Department of State saying that, the Department of State report saying that they are not aware of any policy, of any categorical policy that once you have two children, a person is subject to forcible sterilization. Does the country report say anything about looking at the websites of the different provinces? No, Your Honor. Okay. Just like to point out, the opposing counsel posits that the petitioner's children would be, would be considered Chinese citizens. That is certainly the case. They would be considered Chinese citizens, but that is not the distinction that is drawn for purposes of the family planning policy. Again, the Department of State report has, has, has a document that states that even though United States, that even though citizen, children born in the United States are considered citizens of China, they are not necessarily considered residents of mainland China for purposes of the family planning policy. So I don't, so I don't think that that is the, that is the key distinction in this case. Before you sit down, can I ask you, are you familiar with Shen v. Holder, Seventh Circuit case that was decided in May? Yes, Your Honor. Is the department going to petition for cert in that case? I don't believe that we will, Your Honor, I'm not, I'm not. Immigration law is the same, the same standards throughout the United States, right? We don't have special immigration law on the Fourth Circuit. No, absolutely not. And different immigration law on the Seventh Circuit. No, absolutely not, but I think that, that might not be the best vehicle for, for us to petition for cert. We, we would see whether maybe another one comes up in the future. I think that the Seventh Circuit has taken it in a certain direction and... The Seventh Circuit is very skeptical of government in these areas. But I would, but I would point out that a lot of the problems with the agency's decision come in the context of motions to reopen where the, you know, where they, when they decide the case on whether they establish a prima facie eligibility before they reopen. You know, the, the board's not allowed to weigh evidence in that context. And I think the board then, there's more, there's a greater chance of error then in considering the evidence. But here we have a case on the merits where the agency, where the fact finder is supposed to look at the evidence and weigh the record. Indeed. And so I think... Now, yeah, let me ask you, since we're talking about the Seventh Circuit case, the Robert troublesome to them too, because they said, as far as we can tell, the board ignored the Robert Lynn document, and that's a problem. We cannot sustain the exclusion of documents without some explanation for the basis of the ruling. The Robert Lynn document cuts the ground out from under what the board called the key aspect of this case, that because Chen's children were born abroad, she is no longer in danger of being forced to undergo sterilization. How is your case different from this Seventh Circuit case? And how, how would you go about explaining a distinction that we could rely on? Well, first of all, we point out that this was not a document that was relied upon by the petitioners at any point. But does that matter if it's in the record? I think it does. I think that, you know, in the 4300 page record, when petitioners file an appellate brief to the board pointing to specific evidence to be considered, the board is entitled to rely on the arguments and the evidence presented on that, on that appellate brief. And so the fact that it didn't mention this document, I think is perfectly understandable. But, you know, as to the question of the Robert Lynn, I mean, I just, it is difficult for me to say it's that, you know, who is, who is Robert? Because their province website is the point. And so, I mean, if, if, if the country report of the State Department is relying on according to the province officials, then why isn't this at least as legitimate as some hearsay from province officials? Well, it is from the province website. Maybe, maybe it was an error. I don't know if that is still the ongoing policy now. I don't know if it ever was. I mean, because the evidence wasn't, wasn't pointed out and argued, and we just don't know exactly the context of it. It's like, well, it came from a website. Well, when, when, when was the website? Well, putting aside then for a moment the Robert Lynn document, how do you distinguish the Seventh Circuit case? If we're in the Seventh Circuit, do you lose this case? Do we remand? I don't, I don't think we do because. Tell me why not. Um, because the, the evidence, because the agency here did consider the evidence explicitly, a lot of the evidence, maybe not, not the Robert Lynn document, but it did go through a lot of the evidence that the petitioners presented and found and gave it diminished weight. And the reasons for giving it diminished weight are perfectly defensible. Whether it was the, whether it was the village committee reports that are deemed ineffective by the, according to the Department of State reports. Whether it was individual affidavits that said the petitioners were going to be sterilized in China that are, um, that are from people who are not similarly situated. And as the immigration judge pointed out, was anecdotal in nature. Whether it was the Ranzone 1 document that, you know, that's, that had that, that, that language, that powerful language. But in the end, we have no content. We don't know where it appeared from. Counsel simply put it in the record. And I think it's been provided, you know, placed in several cases. There are several cases where those, those documents have been simply put in. Well, I don't think the government's in much position to quarrel with using the same document in every case. Do you? No, Your Honor, fair point. Um, but, but the point is that, you know, unlike perhaps what happened in Chen, you know, the agency here did engage the documents that the petitioners, uh, put, argued and, and relied on in, in, in terms of their case. Is there some procedural difference between the two cases? I don't, I don't, um, the Chen case, I'm not, I don't remember whether that was a case that it's on the merits or on the motion to reopen. Um, I believe, I simply think they might have been on the merits. The review of the BIA's decision affirming denial of her application for asylum. No, so no, they're both on the merits. Yeah, I would simply say that, that the criticism of Judge Posner in, in that decision, I think are not really applicable in this decision, in, in this case, because the board did go through, the IJ and the board did. I'm not really claiming that he, his, um, criticisms are ill founded. You're not quarreling with that case. You're saying that this case is different, this decision. Yes, yes, absolutely. So if we should, we should conclude that it's not, we would go the same way. Well, Your Honor, if, if you've reached that decision, then, uh, I mean, I don't. Okay, thank you. Okay, well, no more questions. Thank you, Your Honor. All right, Ms. Torres, you have some time remaining. Thank you, Your Honor. How does that thing get in the record if you don't put it there and the government doesn't put it there? I don't really understand. This document that my colleague has been. I believe it's in our background. The petitioners put it in the record, Your Honor. But you didn't rely on it. We didn't specifically refer to it in our briefs. But I would like to address counsel's statement that in order to be persecuted under the family planning policy, one's children must be registered in the household. There's nothing to support this in the record. The Chinese government, they're concerned with overpopulation. That's why they have a family planning policy in China. They're not going to forego implementing the policy merely because the children are not registered in the household. I think that probably it is. They're not going to know about the children. They sort of, the theory behind that is they're not going to know about the children unless the children are registered. Yes, but as I stated earlier, they're human beings. You can't just hide children. And I'd also like to refer back to the certificates from the local family planning committees in the petitioner's locality, specifically the family planning office of May Wah Town and the family planning committee of Maui District. These certificates specifically refer to the petitioner's by name. They state what the policy is and how it's implemented, including forcible sterilization after having two children. And the IG's only mention of these was to merely find that the state department reports are more persuasive. There was no analysis of these certificates, which specifically state that in the petitioner's locality that these officers are aware of who the petitioners are. They're aware that they have two children. If they return back, even though they're children, it specifically states, even though their children are born in the United States, they're still considered Chinese citizens, they will be counted under family planning policy. The board's only mention was really to make de novo findings as to the veracity of these letters and certificates, which none of which the BIJ found. They found that the board found that they were unsigned. There's no authors listed. They're unauthenticated. And that village committees are not authorized to issue these. First of all, as to the authorization issue, neither of these family planning committees are village committees. So that's irrelevant. This is the Family Planning Office of Maywa Town and the District Family Planning Committee. As to the fact that they're unsigned and that the author's names aren't listed, there's nothing, the board cited to nothing in the record to show that the policy or custom of these local family planning policies is to personally sign these certificates. Each one of them has a seal from the Family Planning Committee. And as to the fact or the allegation that they're unauthenticated, first of all, these are not official records. They're not birth records, death records, land records. Um, so they don't have to be authenticated under the section 1287.6. Furthermore, the petitioner Chen did give testimony as to who obtained these certificates, when they were obtained, and where they went to obtain them. So a foundation was laid. And again, I would just like to stress that these are from the local family planning committees in their local areas in China. They specifically refer to the petitioners by name and state that they will be, their children will be counted under the policy and they are subject to the family planning policy. Your honors, I again stress that neither the board nor the IJ properly considered any of this very material evidence with regard to the Christian claim or the family planning claim of the local conditions in the petitioner's specific locality. Substantial evidence just does not support neither the board's nor the IJ's denial of asylum or withholding removal. The board and the IJ erred in failing to find that the petitioners established a well-founded fear of persecution based on their Christian claim and based on the family planning policy. The petitioner submitted extensive evidence establishing that they're devoted Christians, they will attend underground church if they're sent back to China. They established that local officials persecute Chinese citizens who attend underground church. The petitioners also established that based on China's family planning policy, their children will be counted and if they're sent back to China, the petitioners face at least a reasonable possibility of being forcibly sterilized. And I would just like to point out also as the IJ pointed out that in INS versus Cardoso-Fonseca, the court stated that a court may grant asylum when the chance of future persecution is as low as 10%. Based on the evidence in this record, the petitioners have certainly established that they have at least a 10% chance, if not more, chance of being persecuted if they return back to China. If your honors have nothing further, thank you.
judges: William B. Traxler, Jr., Diana Gribbon Motz, Barbara Milano Keenan